J-S44029-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: P.D.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: P.S., NATURAL MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 617 WDA 2019 |

Appeal from the Order Entered March 25, 2019
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000159-2018

| | | |
|---|---|---|
| IN THE INTEREST OF: P.M.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: P.S., NATURAL MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 618 WDA 2019 |

Appeal from the Order Entered March 25, 2019
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000160-2018

| | | |
|---|---|---|
| IN THE INTEREST OF: K.X.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: P.S., NATURAL MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 619 WDA 2019 |

Appeal from the Order Entered March 25, 2019
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000161-2018

BEFORE: SHOGAN, J., McLAUGHLIN, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY McLAUGHLIN, J.:                    **FILED AUGUST 13, 2020**

P.S. ("Mother") appeals from the orders involuntarily terminating her parental rights to her three minor children, K.X.S. (born March 2010), P.M.S. (born July 2007), and P.D.S (born August 2006).[1] Mother argues Children Youth and Families of Allegheny County ("CYF") failed to establish that termination was in the children's best interest. We affirm.

CYF became involved with this family in February 2016, "helping [M]other with housing, school attendance, medical care, and budget." Trial Court Opinion ("1925(a) Op."), filed June 11, 2019, at 2. Later in January 2017, CYF filed dependency petitions for all three children because of some issues with Mother's housing, the children's attendance in school, and a medical issue with P.D.S. *Id.* In February 2017, the trial court adjudicated all three children dependent. "On February 28, 2018, [M]other was convicted of Felony Aggravated Assault, Misdemeanor Endangering the Welfare of Children and was ordered not to have contact with the victim [P.D.S.]." *Id.* at 3. In July 2018, CYF filed a petition for involuntary termination of Mother's parental rights. The trial court held a hearing on March 22, 2019, where Jamie Weaver, the assigned caseworker, and Dr. Patricia Pepe, the court appointed psychologist, testified. Prior to taking testimony, the trial court found termination proper as to all three children under Section 2511(a)(9)(ii), based on the parties' stipulation that Mother had been convicted of aggravated

---

[1] Due to the similarity of initials between Mother and children, we have added in the children's middle initials for clarity.

assault against P.D.S. N.T., Termination Hearing, 3/22/19, at 10, 13. Therefore, the court proceeded with the termination hearing to determine if termination was appropriate under Section 2511(b).

CYF first presented the testimony of Ms. Weaver, who was assigned to the case in December 2017. Ms. Weaver testified that upon coming into the care of CYF, all the children were "malnourished," "lacking in hygiene," and had "marks and bruises." *Id.* at 31-32. She also testified about the children's initial behaviors. She noted that K.X.S. exhibited "very sexualized behavior," such as wanting to "sit on laps with his hands on a woman's chest." *Id.* at 35. She described P.M.S. as having physical boundary issues in that she would "[g]o through people's pockets, purses, what have you in a way that was not age-appropriate." *Id.* She also testified that P.D.S. would not make eye contact and "would often curl his shoulders to the left and down when somebody would speak to him." *Id.* at 36. However, she testified that these behaviors dramatically changed since they have been in the care of their foster parents. P.D.S. now is "proud to be who he is" and "will puff his chest out" when he is introduced to other people. *Id.* P.M.S.'s "behavior has declined" and is now age-appropriate. *Id.* at 35. K.X.S.'s "behavior has essentially ceased." *Id.* Ms. Weaver testified that the children are all in school and "doing well and on track for graduation." *Id.* at 16.

K.X.S. and P.M.S. are in the care of the Colemans. *Id.* at 20-21. Ms. Weaver described their interactions with their foster family as follows:

> [P.M.S.] and [K.X.S.] present as very comfortable in their foster home. And very well-bonded to their current caregivers. When I fi[r]st met [P.M.S.] and [K.X.S.], they were hesitant to speak to a new person and often referenced back to the Colemans for reassurance and almost permission that they were safe to talk to a new person.
>
> The children are very physically affectionate with the foster parents, often sitting on laps, hugging, hanging on top of people. . . .
>
> [The Colemans] are very comfortable with the children, often redirecting gently and then using humor as the children learn structured goals and boundaries. They are very positive and perceive the children in a very appropriate and positive way. In the same vein, they also hold the children accountable for their own behavior.

*Id.* The children also referred to the Colemans as their "mom and dad." *Id.* at 22.

Ms. Weaver testified that P.D.S. is in a separate therapeutic foster home due to his diagnosis of Post Traumatic Stress Disorder ("PTSD"). *Id.* at 17. His foster care parent, Josephine Emmanuel, is certified as a specialty foster care parent. *Id.* at 16. Despite being in separate homes, the children visit with each other weekly and Ms. Emmanuel has arranged for the children to have visitation, overnight visits, and community visits with each other. *Id.* at 23. Ms. Weaver also testified that P.D.S. has adjusted well to his foster home and family:

> [P.D.S] is very comfortable. A very good example is when I took [P.D.S.] to the foster home when we moved in for the first time. The Emmanuel family were all there. The brothers, sisters, grandmother. And they made sure to bring community members. People that they interact with everyday. Friends of Mark [Ms. Emmanuel's adult son] that work with him in his therapy role. Neighborhood children.

***

[P.D.S.] is a very reserved child and often would keep a sort of flat affect because he doesn't like to show his emotion. I've never seen that boy smile so much in such [a] troubled situation. He was just grinning from ear to ear and so pleased that all of those people were there for him.

In every foster home visit I have completed since then, and it has been well over the monthly, I've seen [P.D.S.] at least twice a month since his placement there and he is just very comfortable. Always sitting near Miss [Emmanuel]. Always referencing [her children]. Asking to play basketball. Planning events in the community. He seems to be trying to put down roots and connect.

*Id.* at 25-26.

Ms. Weaver testified that she believed it would be in the best interests of the children's physical and psychological needs to have Mother's parental rights terminated and the goal changed to adoption. *Id.* at 36. Additionally, she testified that since being in CYF's care, none of the children have requested visitation with Mother. *Id.* at 39-40.

Dr. Pepe testified as a court expert and explained her interactions with each child. *Id.* at 49 (stipulation to adopt Dr. Pepe as a court expert). She testified that "[a]ll three of the children are deeply psychologically scarred" and diagnosed all three children with PTSD. *Id.* at 53. During her sessions with the children they explained that "[t]hey are extremely afraid of Mother." *Id.* at 54. In a private session, P.D.S. told Dr. Pepe that Mother was "99 percent more mean than nice." *Id.* at 58. P.M.S. in her private session with Dr. Pepe stated that she "doesn't feel good about herself because her mother would pull her hair out and that is why her hair isn't in good shape. So she

feels very poorly about how she looks." *Id.* at 61. Additionally, K.X.S. in his private time with Dr. Pepe said "he was very anxious to speak to [Dr. Pepe] about his mother because his mother told him not to share secrets." *Id.* at 62. He also gave the following unsolicited statement to Dr. Pepe: "[Y]ou changed my life because I don't have to be afraid anymore." *Id.* at 64. Dr. Pepe testified to one occasion when the children were in her waiting room with Mother and Mother pulled out a knife:

> Apparently, [P.D.S.] - - the foster parents were there and I guess they reported it. I did not see it, but [P.D.S.] gave a very clear description of the knife. It was apparently very unusual. And later, the mother was arrested at court and she had that knife on her and it fit the description of the knife that she had shown them in my waiting room. So she had shown [P.D.S.] in the waiting room. And called him a snitch.

*Id.* at 59. P.D.S. also spoke with Dr. Pepe about being stabbed by his Mother. *Id.* at 60.

The children stated that "[Mother] whooped us to death[,]" and "put cinnamon in their mouth," causing them to become very thirsty. *Id.* at 60-61. Dr. Pepe testified that it would be in the best psychological interests of the children to move forward with adoption because remaining in contact with Mother "would cause the children very grave harm." *Id.* at 74.

Counsel for the children, Cynthia Moore, Esquire, placed the children's preferences on the record. *See id.* at 3 (counsel stating she represents all three children). She stated that she spoke with each child and that all of them

advised that they wanted Mother's rights terminated so that they could be adopted. *See id.* at 77-78.

Upon reviewing all of the testimony, the trial court ordered that Mother's parental rights be terminated under Section 2511(b):

> The [c]ourt also concludes as a matter of law that when considering record testimony as to the psychological, emotional, physical and mental needs and welfare of the children, when considering that testimony relative to [M]other and that testimony relative to the foster placements of the children in making the appropriate analysis based on the [c]ourt being directed by the relevant case law [a]s to the way in which that analysis should take place, that it best meets the needs and welfare of the children to terminate the rights of the subject [M]other and proceed to adoption in a loving environment to achieve a life that they deserve.

*Id.* at 85-86.

On April 25, 2019, Mother filed three timely notices of appeal at each lower court docket number. Each notice included all three docket numbers. We placed this appeal on hold pending the resolution of several *en banc* cases considering the rule of **Commonwealth v. Walker**, 185 A.3d 969, 971 (Pa. 2018). There, our Supreme Court announced that "where a single order resolves issues arising on more than one lower court docket," an appellant must file separate notices of appeal, and the failure to do so requires us to quash the appeal. *Id.* We have now resolved the *en banc* cases and held that the inclusion of multiple docket numbers in a single notice of appeal does not require quashal, so long as the appellant has submitted a notice of appeal at each lower court docket number for which the appealed-from order resolves

issues. *See Commonwealth v. Johnson*, -- A.3d --, 2020 PA Super 164, *5 (filed July 9, 2020) (*en banc*). Mother has done so here. We therefore address the merits of this appeal.

Mother raises one issue: "Did the trial court abuse its discretion and/or err as a matter of law in concluding that termination of [her] parental rights would serve the needs and welfare of the [c]hildren pursuant to 23 Pa.C.S.[A.] § 2511(b)?" Mother's Br. at 7.

Our standard of review in a case involving the termination of parental rights is as follows:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.
>
> ***
>
> Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012) (citations omitted).

Section 2511 of the Adoption Act governs involuntary termination of parental rights. Once a party seeking termination proves by clear and convincing evidence that termination is warranted under Section 2511(a), the court then "must consider whether the child's needs and welfare will be met by termination pursuant to subsection (b)." *In re Z.P.*, 994 A.2d 1108, 1121 (Pa.Super. 2010).

Section 2511(b) provides the following:

> **(b) Other considerations.**--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(b). In conducting this analysis, the court should determine whether a bond exists between the child and parent and if termination "would destroy an existing, necessary and beneficial relationship." *In re Z.P.*, 994 A.2d at 1121.

Mother argues that CYF presented insufficient evidence that termination was in children's best interests under Section 2511(b). Mother claims that "[t]he trial court impermissibly shift[ed] the burden of proving the nature of any parent child bonds to [Mother]." Mother's Br. at 17 (citing 1925(a) Op. at 8). She notes that "consideration of the needs and welfare of the child

pursuant to [Section 2511](b) focuses primarily on the welfare of the child and **not the fault of the parent**.” *Id.* at 15. (emphasis in original). Mother maintains that the trial court focused on her conduct by “berating [Mother] for the circumstances that brought the [c]hildren into care.” *Id.* at 17 (citing 1925(a) Op. at 9). The record belies Mother’s argument.

Mother is correct that under Section 2511(b), the focus is on the child, not the parent. *In re Adoption of R.J.S.*, 901 A.2d 502, 514 (Pa.Super. 2006). “The court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond.” *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa.Super. 2005). Additionally, “[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into needs and welfare of the child.” *Id.*

Here, the trial court relied on the extensive testimony of Dr. Pepe and Ms. Weaver, finding that it was “credible” and “authentic.” N.T., at 84-85. In determining that it would benefit the needs and welfare of the children to terminate Mother’s parental rights, it provided the following explanation:

> The case at bar, when considering the record as a whole, including the testimony of [Dr. Pepe], demonstrates clearly that any connection in the form of a relationship between the [M]other and the three (3) subject children is not only not wholesome or not the type of relationship that the policy of this Commonwealth would envision for a parent and a child, but rather a connection which is detrimental, abusive and destructive. . . .
>
> The present case is not one of those situations of just parental neglect. Instead this case is one of neglect as well as active abuse. These children suffered beatings at the hand of [M]other, psychological trauma by her conduct, and verbal threats of dire

- 10 -

physical harm. No evidence has been presented of a positive emotional bond between [M]other and any of these children. In fact all evidence has shown that any emotional bond that may exist is only one of fear. Fear, that [M]other will discover where they are now living in a happy healthy environment. Fear, that [M]other will punish them for living in this productive environment. Fear, that she will remove them from their new homes that provide a healthy living environment, and subject them to all of the behavior that has caused all of them to now suffer from PTSD. . . . These children are now in foster care where they are receiving those necessities to which they have been entitled all along. Their emotional, psychological, educational, medical, and physical needs are all being appropriately met. All of the positive steps that these children have been able to make after being removed from [M]other's care, would, be drastically reversed and these children would be irreparably harmed if they were to be returned to her care.

1925(a) Op. at 8-9. We discern no abuse of discretion by the trial court in terminating Mother's parental rights under Section 2511(b).

As the trial court noted, the relationship between Mother and her three children was not only one of neglect but also abuse. Each child expressed to Dr. Pepe their fear of Mother, with K.X.S. telling Dr. Pepe, "you changed my life because I don't have to be afraid anymore." N.T., at 64. The children have all improved tremendously since being out of Mother's care and have adjusted well in their foster homes. Furthermore, the children are receiving "[i]ntangibles such as love, comfort, security, and stability," that they did not have while in Mother's care. *In re C.M.S.*, 884 A.2d at 1287. The certified record supports that the relationship between Mother and children was not a "necessary and beneficial relationship," but rather a relationship based on fear. *In re Z.P.*, 994 A.2d at 1121. Due to being diagnosed with PTSD as a

result of the abuse and neglect of Mother, the welfare and needs of the children would be best met by their willing and able foster families, rather than their abuser. Mother's claim lacks merit and therefore we affirm the order of the trial court terminating her parental rights.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/13/2020